## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD BASCIANO and LOIS M. PALMER AS EXECUTORS OF THE ESTATE OF SAMUEL RAPPAPORT, DECEASED, and Derivatively on Behalf of the SAMUEL RAPPAPORT FAMILY PARTNERSHIP, | : : : : : : : | CIVIL ACTION |
| **Plaintiffs,** | : : | |
| v. | : : | NO.   02-CV-3752 |
| CARL CORDEK, RRR MANAGEMENT COMPANY, INC., T&W RAPPAPORT INVESTMENTS, LTD., and WIL WES RAPPAPORT, Individually and as General Partner of the SAMUEL RAPPAPORT FAMILY PARTNERSHIP and T&W RAPPAPORT INVESTMENTS, LTD. | : : : : : : : | |
| **Defendants.** | : : | **JURY TRIAL DEMANDED** |

## A M E N D E D   C O M P L A I N T

Plaintiffs Richard Basciano and Lois M. Palmer, the Executors of the Estate of Samuel

Rappaport, Deceased, (collectively the "plaintiffs" or the "Executors"), by their attorneys

Obermayer Rebmann Maxwell & Hippel LLP and Conrad O'Brien Gellman & Rohn, P.C., for

their amended complaint against defendants, state and allege as follows:

402599

## NATURE OF THE ACTION

1.      This action seeks to redress and enjoin multiple fraudulent schemes engaged in by defendants Carl Cordek and Wil Wes Rappaport to defraud the Estate of Samuel Rappaport (the "Estate") of millions of dollars in cash, property, loan receivables and other assets through false and fraudulent asset transfers and financial and accounting manipulations.  The federal claims asserted herein arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").  Supplemental state law claims are stated for breach of fiduciary duty, fraud, conspiracy, waste and mismanagement of Estate assets, and breach of contract.

2.      As the result of defendants' wrongful actions and illegal combination and conspiracy, the Estate has been deprived of the honest services of its agents and representatives, has been injured in its business and property in an amount in excess of $150,000, exclusive of interest and costs, and has suffered and will continue to suffer irreparable harm from the actions of defendants for which appropriate declaratory and injunctive relief is demanded.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over plaintiff's claims pursuant to 18 U.S.C. §§ 1964(a) and (c); 28 U.S.C. §§ 1331, 2201 and 2202; and applicable principles of supplemental jurisdiction under 28 U.S.C. § 1367(a).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), as all defendants are found, reside and/or transact their affairs within this district, and the events giving rise to plaintiffs' claims occurred within this district.

402599

**PARTIES**

5.      Plaintiff Richard Basciano ("Basciano") is an adult individual and Executor of the Estate of Samuel Rappaport, Deceased, having offices in New York and within this district at 117 South 17th Street, Fifth Floor, Philadelphia, Pennsylvania 19103.

6.      Plaintiff Lois M. Palmer ("Palmer") is an adult individual and Executor of the Estate of Samuel Rappaport, Deceased, having offices in New York and within this district at 117 South 17th Street, Fifth Floor, Philadelphia, Pennsylvania 19103.

7.      Plaintiffs bring this action in their capacities as Executors in the Estate's own right, and derivatively on behalf of the Samuel Rappaport Family Partnership which is ninety percent (90%) owned by the Estate.  The Estate's offices are maintained in this district at 117 South 17th Street, Fifth Floor, Philadelphia, Pennsylvania 19103.

8.      Derivative plaintiff The Samuel Rappaport Family Partnership (the "Family Partnership" or "Partnership") is a Pennsylvania limited partnership having its principal place of business and registered office within this district at 117 South 17th Street, Thirteenth Floor, Philadelphia, Pennsylvania 19103.  The Family Partnership, although owned ninety percent (90%) by the Estate as a limited partner, is dominated, directed and controlled, and its affairs conducted, by defendant Wil Wes Rappaport, as its sole general partner, and defendant Carl Cordek, as its general manager and controller.

9.      Defendant Carl Cordek ("Cordek") is an adult individual who resides and transacts his affairs within this district and maintains his offices at 117 South 17th Street, Thirteenth Floor, Philadelphia, Pennsylvania 19103.  Cordek, a financially-trained businessman and Certified Public Accountant, was employed by and served Samuel Rappaport (the

402599                                            3

"decedent") during his life as the decedent's chief financial officer, and is presently, and has at all times relevant to this complaint been, the general manager and controller of defendant RRR Management Company, Inc., and the general manager and controller of defendant T&W Rappaport Investments, Ltd., and the Family Partnership.  Cordek, together with defendant Wil Wes Rappaport, directs, conducts and controls the affairs of defendant RRR Management Company, Inc., defendant T&W Rappaport Investments, Ltd., and the Family Partnership. Cordek has been the principal architect, in combination and conspiracy with defendant Wil Wes Rappaport, in the development and implementation of the schemes alleged hereinafter which have been pursued to defraud the Estate of its assets and property in violation of federal and state law.

10.     Defendant RRR Management Company, Inc. ("RRR Management" or "RRR"), is a Pennsylvania "S" corporation wholly owned by defendant Wil Wes Rappaport having its headquarters and maintaining its offices within this district at 117 S. 17th Street, Thirteenth Floor, Philadelphia, Pennsylvania 19103.  By virtue of a written Management Agreement in effect between RRR and the Estate from January 1, 1995 through March 4, 2002, RRR became the fiduciary for the Estate, and, in such capacity, inter alia, managed the assets of the Estate; conducted the day-to-day operations of the Estate; prepared the Estate's income tax returns and financial statements; controlled and supervised the audits of the Estate's financial statements; handled the Estate's cash and disbursements; and created, prepared, maintained and controlled the books and records of the Estate.  At all times relevant RRR has also acted, and continues to act, as the agent and fiduciary of the Samuel Rappaport Family Partnership and defendant T&W Rappaport Investments, Ltd.  RRR is dominated and controlled by defendants Wil Wes Rappaport and Cordek, both of whom directly conduct its affairs.  As alleged hereinafter, Wil

Wes Rappaport and Cordek have wrongfully utilized their control over RRR, the Family Partnership and defendant T&W Rappaport Investments, Ltd., to defraud the Estate of its assets and property in violation of federal and state law.

       11.    Defendant T&W Rappaport Investments, Ltd. ("T&W Investments" or "T&W"), is a Florida limited partnership having a registered office within this district at 117 South 17th Street, Thirteenth Floor, Philadelphia, Pennsylvania 19103.  T&W is dominated and its affairs are directed and controlled by defendants Wil Wes Rappaport, its sole general partner, and Cordek, its general manager and controller.  T&W is owned forty-five percent (45%) by Wil Wes Rappaport as general partner, forty-five percent (45%) by Tracy Rappaport Scott ("Tracy Rappaport" or "Tracy") as a limited partner, and ten percent (10%) by the Estate as a limited partner.

       12.    Defendant Wil Wes Rappaport ("Wil Rappaport" or "Rappaport") is an adult individual who resides and transacts his affairs within this district and maintains his offices at 117 South 17th Street, Thirteenth Floor, Philadelphia, Pennsylvania 19103.  Wil Rappaport is the son of decedent Samuel Rappaport and Rita Rappaport ("Rita"), and the brother of Tracy Rappaport Scott ("Tracy Rappaport" or "Tracy"), the only other child of Samuel and Rita Rappaport.  Rappaport is the sole owner, president and a director of defendant RRR Management Company, Inc., and is the general partner of defendant T&W Investments, and the general partner of the Family Partnership.  Wil Rappaport, together with defendant Cordek, dominates, directs and controls defendant RRR, defendant T&W, and the Family Partnership, and conducts their affairs.  Acting in combination and conspiracy with Cordek, Rappaport has planned, joined, orchestrated, assisted, furthered and participated in the multiple schemes utilized to defraud the

Estate of its assets, money and property in violation of federal and state law as more specifically alleged hereinafter.

## FACTUAL BACKGROUND

### The Decedent

13.    In life, Samuel Rappaport owned and operated personally and through a myriad of partnerships and other entities controlled by him, numerous commercial real estate properties, primarily in the greater Philadelphia area.  Although involved in other businesses, including the ownership and operation of retail stores, a hotel, a toll bridge company, and a sewer utility company, real estate ownership, speculation and development were the principal business endeavors engaged in by the decedent during his life.  None of the decedent's family members were involved in the operation or management of his substantial real estate holdings.

14.    On or about December 3, 1982, Samuel Rappaport created the Family Partnership with himself as sole general partner holding a 90% interest and his son and daughter as limited partners holding 5% each.

15.    The business of the Family Partnership was to hold, own, lease, manage, acquire and dispose of real estate owned by Samuel Rappaport, and to do such other acts and engage in such other businesses as he desired.  Until his death, Samuel Rappaport ran the Family Partnership as his own and dominated and completely controlled its affairs.  Upon Samuel Rappaport's death, his general partner interest became a limited partner interest and Wil Rappaport was appointed the successor general partner of the Partnership.  The largest single asset of the Family Partnership is the Gateway Towers Parking Garage (the "Gateway Towers Garage" or "Garage"), located in Pittsburgh, Pennsylvania.

402599

6

16.     T&W Investments was created by the decedent in or about November 1986 to own certain Florida commercial and residential real estate, and to do such other acts and engage in such other businesses as Samuel Rappaport desired.  Although created as a limited partnership majority-owned by his children (each of whom hold a 45% interest, with the remaining 10% now held by the Estate), Samuel Rappaport controlled and conducted the affairs of T&W at all times until his death in 1994.  At the time of his death, Samuel Rappaport was owed over $13 million in loans he funded and advanced to T&W during his life.  Upon decedent's death, Wil Rappaport became the successor general partner of T&W.

17.     To oversee his many businesses and properties Samuel Rappaport created an unincorporated proprietorship known as SR Management Company ("SR" or "SR Management").  SR employed the decedent's long-time employees and staff, including Cordek, and was utilized by the decedent to operate and manage his real estate and business interests.  None of the decedent's family members were involved in or employed by SR.

18.     Samuel Rappaport died testate on September 6, 1994 while a resident of Solebury Township, Bucks County, Pennsylvania.  His last will and testament (the "last will" or "will") dated September 3, 1994, a true and correct copy of which is attached hereto as Exhibit 2 was admitted to probate before the Bucks County Register of Wills (the "Register of Wills") on September 13, 1994.

19.     At the time of his death, the decedent was involved in acrimonious divorce proceedings with his wife Rita, and was living separate and apart from her.  He was also estranged from his daughter Tracy.

20.     Although not estranged from his son, the decedent had experienced many difficulties with Wil and had lost confidence in his abilities.  At the time of decedent's death, Wil

Rappaport was working in one of the decedent's retail stores in Philadelphia at an annual salary of approximately $17,000.

21.      Approximately six (6) weeks before he died, the decedent confided to Basciano, a trusted business partner and one of his and the Rappaport family's closest and most trusted friends, that he had made no provision in his then existing will for his wife and daughter and had disinherited them.  He also confided to Basciano that he had designated Basciano as an executor of his estate and trustee of the trusts created under the will, and that he intended to give a power of attorney to Basciano so that Basciano could take control over his personal affairs, assets and business interests during the decedent's illness.

22.      Basciano, acting on the basis of his longstanding friendship with the decedent and out of concern for the Rappaport family, spoke to the decedent about his decision to disinherit his wife and daughter and urged the decedent to include Rita and Tracy in his will as a matter of fairness and to avoid disastrous tax consequences that would result to the estate by the exclusion of his wife from the will.

23.      Reconsidering his position, the decedent decided to have a new will prepared to make provision for his wife Rita, but persisted in his refusal to make any provision for his daughter Tracy.  Although the decedent decided to have a new will prepared many weeks before his death, the decedent did not receive his revised last will until September 1, 1994, a date on which Basciano could not be with him.  Execution of the last will did not occur on that day, however, but was held over until September 3, 1994.  As the revised will was being read, the decedent discovered that Basciano's name had been omitted from the listing of his executors and trustees, and that only Morris P. Hershman ("Hershman"), a long time employee and attorney-at-law who acted as his personal and business counsel, and one Charles Podhaizer, a friend and

business associate of the decedent, were included as executors and trustees. Upon discovering the omission, the decedent immediately directed the handwritten insertion of Basciano's name into the will in front of his witnesses, initialed the insertion and each page of the will, and executed the instrument as his last will.

24.     Charles Podhaizer renounced his appointment as an executor before the will was probated, and the Register of Wills issued letters testamentary to Basciano and Hershman on September 13, 1994. Hershman subsequently resigned his appointment as an executor and trustee in September 1996, at which time Basciano sought to designate decedent's wife Rita as co-executor and trustee. Because Rita's attorneys objected to any family members serving as executors, and her appointment was also opposed and objected to by Wil Rappaport, Basciano, pursuant to the provisions of the will, appointed Lois M. Palmer as a successor co-Executor and Trustee with the knowledge and consent of Rita, Tracy and Wil Rappaport.

### Decedent's Last Will

25.     Under the terms of his last will, the decedent bequeathed his tangible personal property (clothing, furniture, jewelry, etc,) to his son and directed that his entire residuary estate be distributed into generation skipping trusts under which any net income would be distributed to his wife Rita for her life, and upon her death, to his son for life as the successor income beneficiary. Upon Wil Rappaport's death, the principal of the trusts is to be distributed to the decedent's grandchildren.

26.     Because the decedent's last will excluded Tracy and only made limited income provisions for Rita, Rita advised Basciano and Hershman, the then appointed co-Executors, that she was considering an election against the will in order that she might receive a greater share of the decedent's Estate and be able to provide separately for Tracy.

27.     At the time of Rita's declared contemplation to elect against the will, the Estate was highly illiquid and cash poor.

28.     Recognizing that an election against the will would have ruinous consequences for the Estate, Basciano attempted to mediate the disputes within the family and ultimately negotiated a resolution and settlement among Rita, Tracy and Wil Rappaport that removed the threat of Rita electing against the will, and resulted in the inclusion of Tracy and her children as residual beneficiaries of the Estate on equal footing with Wil Rappaport and his issue.

29.     Under the terms of the settlement negotiated by Basciano, Wil Rappaport agreed to disclaim one-half of his residuary income interests in favor of his sister Tracy and her children, and Rita agreed to relinquish and waive her right of election against the will.  The settlement also provided Rita with stipulated minimum income distributions and other financial benefits from the Estate during her life.  The provisions of the settlement were memorialized in a Family Settlement Agreement executed by the parties in May 1995, and subsequently approved by Decree of the Orphans' Court Division of the Bucks County Court of Common Pleas (the "Bucks County Orphans' Court"), on May 31, 1995.

### Cordek's Efforts To Prevent The Appointment
### Of Basciano As The Decedent's Personal Representative

30.     The Executors have recently learned that Cordek and Hershman procured or otherwise caused the omission of Basciano's name from the final typed version of decedent's last will in an effort to prevent Basciano from becoming an Executor and Trustee of the decedent's Estate.

31.     Cordek attempted this maneuver, upon information and belief, because he did not want Basciano, a trusted friend and business associate of the decedent, and an independently successful and experienced real estate owner and businessman in his own right, to become an

Executor and Trustee for the Estate as Cordek had insinuated himself into virtually every aspect of Samuel Rappaport's business and financial affairs over the course of his last illness, and was secretly exercising dominion and control over decedent's affairs prior to his death.

32.     As an example of such secret dealings, the Executors have learned that Cordek fraudulently obtained a power of attorney to enter into and consummate two real estate transactions after the decedent's death in which the decedent's interests in two apartment complexes located in center city Philadelphia, known as the Metropolitan Apartments and the Colonnade Apartments, were transferred to a third party, General Electric Credit Corporation ("GE Credit").

33.     The Executors have also recently learned that before the decedent's death, Cordek secretly directed and controlled another real estate transaction in which he obtained, either through false or fraudulent means, or by forgery, Samuel Rappaport's purported signature on a "letter agreement," allegedly executed by the decedent on June 20, 1994, reducing by approximately $4 million the selling price of a multi-million dollar Option Agreement, and then orchestrated the closing on the  Option Agreement sale on August 31, 1994, just six days before the decedent's death.  The Option Agreement sale (hereinafter the "Historic Landmarks Transaction"), involved a transfer of mortgages held by the decedent on properties owned by companies affiliated with Historic Landmarks for Living, Inc., and its principal Stephen E. Solms, to GE Credit, the same purchasing entity involved in the Metropolitan and Colonnade sales.

34.     The Executors believe that Cordek accomplished the Historic Landmarks Transaction without the knowledge of the decedent, and rushed to close the transaction just days before his death so that Basciano would not find out about it.  These allegations are based on the

plaintiffs' knowledge that it was the decedent's practice during his life to discuss significant business transactions with Basciano and Charles Podhaizer, two of his closest and most trusted friends and business associates; the Historic Landmarks Transaction was a highly significant transaction that involved mortgages having a face value of over $20 million; Basciano and Podhaizer attended the decedent during the course of his last illness; and during the final weeks of his life, the decedent reviewed with Basciano and Podhaizer his pending matters and the steps he was taking to attempt to put his business affairs in order but never mentioned or referred to the Historic Landmarks Transaction, including on, before or after the day of closing on August 31, 1994. Further, Wil Rappaport, who was then spending considerable time with his father, was unaware and had no knowledge of the Historic Landmarks Transaction.

35. While the facts and circumstances surrounding the Metropolitan and Colonnade sales and the Historic Landmarks Transaction are under investigation and are not yet fully known to the Executors, the Executors believe that Cordek personally profited from those transactions; usurped for his own personal benefit and gain the business opportunities of the Estate with respect to those transactions; and wrongfully defrauded the Estate out of its interests in those transactions.

36. As part of his efforts to interfere with the decedent's intentions to empower Basciano to act on the decedent's behalf, Cordek also kept secret the power of attorney executed by Samuel Rappaport prior to his death that appointed Basciano as his sole lawful representative to take control during his last illness of all of his assets and to act on his behalf in all matters, including, without limitation, managing and controlling all of his real estate businesses and other assets; managing and controlling all of his cash, accounts, securities and other negotiable instruments; selling or otherwise disposing of his assets; controlling and directing all of his

personal and business affairs; and making all decisions and elections regarding the provision or termination of medical treatment to the decedent.

37.     Despite knowing of the existence of the power of attorney, Cordek failed to advise Basciano of its existence or deliver it to him until long after Samuel Rappaport's death, which rendered the power void as a matter of law.  A true and correct copy of the power of attorney is attached hereto as Exhibit 1.  As indicated on its face, the power of attorney was intended to be issued in August 1994, the month typed on the power, but was modified by hand written change to reflect a date of September 1, 1994, just one day after the Historic Landmarks Transaction was secretly completed by Cordek on August 31, 1994.

38.     By deceitfully and wrongfully withholding the power of attorney from Basciano, and causing the omission of Basciano's name as an Executor and Trustee under decedent's last will, Cordek violated the trust of Samuel Rappaport; obstructed the implementation of Samuel Rappaport's wishes; prevented and precluded Basciano from exercising the supervision and control Samuel Rappaport wished for him to exercise over his assets and affairs prior to his death; and attempted to prevent and preclude Basciano from exercising the control and supervision Samuel Rappaport wished for him to exercise over his assets and affairs subsequent to his death.  As detailed hereinafter, after decedent's death, Cordek continued to secretly plot against Basciano, and persisted in efforts to covertly exercise control over the assets of Samuel Rappaport after Basciano's appointment as an Executor, and enlisted and corrupted Wil Rappaport in his schemes to do so.

## Basciano Rescues The Estate
## From Financial Insolvency

39.     At the time of his death, the decedent was facing staggering liquidity and cash flow problems and was on the brink of insolvency.  Despite his closeness with Basciano, the

decedent did not confide to Basciano the full extent of his financial difficulties, but did request financial help from Basciano in the summer of 1994 to satisfy pressing financial obligations and obtain bank loan extensions.

40.     To assist his friend without knowing the full measure and magnitude of his financial problems, Basciano agreed in June 1994 to pledge $3 million worth of Government of Israel Notes to First Fidelity Bank to enable the decedent to receive an extension of a debt forgiveness agreement with that bank, and thereafter advanced to the decedent in July 1994 a $3 million condemnation award Basciano had received for a taking of one of his own properties.

41.     Only after decedent's death did Basciano learn of the magnitude of the financial problems that confronted the decedent near the end of his life, and become aware that the Estate itself was facing insolvency due to a lack of liquidity, insufficient cash flow and overdue loan indebtedness in excess of $ 30 million.

42.     The financial problems experienced by the decedent resulted from physical deterioration and neglect of his properties during his life, and as a result of his last illness, which caused a loss of tenancies in his properties, reductions in rent rolls, reductions in available cash flow, delinquencies in the payment of real estate taxes, delinquencies in the payment of mortgages and other loan indebtedness, and a growing inventory of health, safety and fire code violations which the decedent and subsequently the Estate were financially unable to address.

43.     The adverse effects of these problems culminated in October 1997, when part of the facade and a sign on a parking garage owned by the Family Partnership in center city Philadelphia collapsed on a prominent Philadelphia jurist, Judge Berel Caesar, who tragically later died from his injuries.

44.     This disastrous event resulted in massive litigation against the Estate, and the prosecution by the City of Philadelphia of unprecedented code enforcement actions against the properties of the Estate.

45.     To address and solve the problems confronting the Estate, Basciano personally pledged his own assets and real estate in order to secure loans for the Estate in excess of $7.4 million which, together with his previous advance of $3 million to the decedent, provided the Estate with over $10.4 million of cash liquidity that ultimately allowed it to cure its loan defaults; receive approximately $15 million in debt forgiveness from its lenders; repair and restore its inventory of properties; and correct the code violations that had impaired and diminished the value of its properties.  Basciano did not seek or receive any fees for these loans, and only charged the Estate the same rate of interest he was personally paying for the loans.

46.     Basciano also concentrated his energies and invested the lion's share of his time over the past seven and three-quarters years, to the detriment of his own personal business affairs, to restore the Estate's properties and financial condition, both of which have flourished under his stewardship.

47.     Solely as the result of Basciano's real estate expertise and willingness to put his own personal fortune at risk to come to the aid of the Rappaport family, the Estate was able to straighten out its cash position; come into compliance with the health, safety and fire codes of the City of Philadelphia; settle the litigations which threatened its existence; achieve appreciations in the value of its assets; and realize increases in its rent rolls from new leasing opportunities and higher value renewals of existing leases and tenancies.

402599

### The Creation Of Defendant RRR Management

48.      Shortly after the decedent's death, Cordek and Hershman urged that a successor corporation to SR Management, the name used by the decedent to manage his assets during his life, be formed to undertake the management of the Estate's assets.  It was proposed that the successor company employ the decedent's long-term employees, including Cordek and Hershman, who would continue in their roles, and also employ Wil Rappaport to work together with Cordek.  Although originally incorporated in September 1994 as "WW Management Company, Inc.," a name which utilized Wil Rappaport's first two initials similar in manner to his father's use of his own initials for SR Management, the company's name was subsequently changed to RRR Management Company, Inc., after Rita and Tracy Rappaport expressed outrage over the use of Wil Rappaport's initials in the corporate name.  Upon the name change, RRR, acting through Cordek and Wil Rappaport, became the managing agent and fiduciary for the Estate pursuant to the provisions of the Management Agreement described in paragraph 10, above, and also became the managing agent and fiduciary for the Family Partnership and defendant T&W Investments.

49.      Believing at that time that Cordek was trustworthy and honest, and not having any basis to question his loyalty and dedication to the interests of the Estate, Basciano went along with the recommended creation of RRR, and also acquiesced in the recommendation that Wil Rappaport become the sole stockholder of RRR, a member of its board of directors, and assume the post of the company's president.  Basciano agreed to these recommendations because he wanted to afford an opportunity for Wil Rappaport to become involved in and learn the real estate business, despite the decedent's lack of confidence in his son.  Wil was thereafter

appointed to his positions at RRR, and Tracy subsequently became an employee of the company as well.

50.     Basciano also went along with this arrangement on the express understanding that authority over RRR's operations would be given to the Executors through the Management Agreement which provided that RRR would perform its services to the Estate "[u]nder the direction and control of the Executors."  Further, Basciano was installed as the chairman of the board of directors of RRR on the understanding that this position would provide him with additional direct supervisory authority and control over Wil Rappaport, Cordek and the other employees of RRR.

51.     To provide the Executors with additional confidence in the arrangements with RRR, the written employment agreement for Wil Rappaport provided that his employment could be terminated for unsatisfactory performance in the judgment of the chairman of the board of directors.

52.     This provision was included in the employment agreement because Wil Rappaport had yet to prove himself and needed supervision and evaluation because of his past difficulties and lack of experience in corporate management or the management of commercial real estate properties, and was intended to insure that if Wil Rappaport could not or would not satisfactorily learn and perform his duties, he could be transferred, demoted or even terminated from his employment at RRR by Basciano.

53.     To implement the functioning of RRR, the Estate leased office space in Philadelphia on the 5th floor of the Architect's Building, located at 117 South 17th Street, in October of 1994.  Until March 15, 2002, RRR, T&W, and the Family Partnership all maintained their offices at this location rent-free.

54.     From and after the formation of RRR, Cordek and Rappaport assumed control over the operations and assets of the Estate; prepared the documents, contracts and other instruments requiring signature of the Executors; prepared, signed and filed the tax returns of the Estate; supervised and controlled the audits of the Estate's accounts by KPMG LLP, the Estate's outside auditors; and created, prepared, maintained and controlled the books of account of the Estate, as well as the books of account of T&W, the Family Partnership and the other entities in which the Estate held an ownership interest.

## The Emergence of Overreaching And Fraud By Rappaport and Cordek

55.     As the fortunes of the Estate improved under Basciano's stewardship, Wil Rappaport repeatedly sought increases in his annual salary from RRR Management, and also sought increases in the amount of monies he was separately receiving from the Family Partnership in his capacity as general partner, even though his combined income by year-end 1998 was in excess of $200,000 -- as compared to the $17,000 he was earning while employed by his father -- and had grown to over $400,000 by the year 2000.

56.     In trying to justify his requests, Rappaport complained to Basciano that his sister Tracy was receiving substantial financial assistance from their mother Rita as a result of the financial benefits Rita received from the Family Settlement Agreement, whereas he allegedly was having financial problems by being "limited" to the sums he was receiving from RRR and the Family Partnership.

57.     These requests alarmed Basciano as the Executor of the Estate because any additional dollars paid to Wil Rappaport or RRR would cause a decrease in the amount of monies available for distribution to Rita Rappaport and the other beneficiaries under the will --

including the decedent's grandchildren the principal remainder beneficiaries -- as modified by the Family Settlement Agreement.

58.     The requests also disturbed Basciano because he knew that Wil Rappaport was receiving and had received substantial sums of money from other sources, including over $200,000 in cash, jewelry, cars and other personal property from his father's Estate, cash distributions from defendant T&W, and over $1 million in profits from the sale of interests he received from the Estate (for an initial investment of less than five hundred dollars) in a Florida hotel known as SR Austin Vista (an investment Basciano recommended and arranged with Rita's support for Wil and his sister Tracy who also received over $1 million in profits from the sale of the hotel on a $450 investment), and because of marked changes he perceived in Rappaport's behavior and demeanor as Rappaport was exhibiting increasing impatience and frustration with the restrictions imposed upon him by his employment contract and the Management Agreement, and was also displaying a growing hostility and arrogance in his dealings with the Executors.

59.     Although Basciano approved some of the increases sought by Rappaport and Cordek as part of Basciano's approval of year-end raises and salary adjustments for the employees of RRR, he limited the adjustments for their salaries and only approved increases commensurate with general, competitive salary levels within the real estate management industry.  Not satisfied with the increases, on two occasions after Basciano approved requests by Rappaport for a $500 weekly salary increase with the understanding that the requests were $500 gross increases, Rappaport deceitfully implemented the raises on the RRR payroll as $500 net increases for himself.

60.     Fearing that Basciano would ultimately discover the extent of their wrongdoing and expose their underlying schemes to defraud the Estate, Cordek and Rappaport orchestrated a plot to remove Basciano as chairman of RRR in June of 2000.

61.     The plot came to light at a scheduled meeting among Cordek and Norman Oshtry, Esquire ("Oshtry"), the general counsel for the Estate, and Robert Friedman, Esquire, special counsel engaged by the Executors to implement the conversion of the Estate into the trusts established by the decedent's will, at which Cordek was to deliver for Basciano's review previously requested copies of contracts involving RRR.  At the meeting, Cordek advised the Estate's counsel that it was not necessary to produce the contracts to Basciano because Basciano had "resigned" his position as chairman of the board of directors.  Oshtry told Cordek that he was not aware of any "resignation" by Basciano, did not believe Basciano had ever resigned his position, and told Cordek that he would bring the matter to Basciano's attention.

62.     Upon learning of Cordek's assertions, Basciano recalled that he and Palmer had previously been presented with numerous documents that Cordek and Rappaport had prepared for signature by the Executors, and that included among those documents were a group that only required his signature.  Based on this recollection, Basciano realized that Cordek, together with Rappaport, was attempting a scheme to remove him as chairman of the board of directors of RRR based on one or more of the documents they had him individually sign.

63.     The plot unraveled when Basciano demanded that Cordek produce the purported "resignation."  Although Cordek at first professed that he would do so, he later backed away from the scheme by claiming that he could not "locate" the document.

64.     In response to this plot as well as Cordek's hostile attitude and unprofessional behavior, Basciano told Cordek that he could no longer remain as an employee of RRR.

402599                                        20

65.     Basciano also confronted Rappaport over this incident.  In an attempt to placate Basciano, Rappaport denied any involvement in the scheme and stated his agreement that Cordek had to be replaced at RRR because of his actions.

66.     Taking Rappaport at his word, and after being advised that Cordek had agreed to resign and announced to the staff of RRR that he would be leaving the company, Basciano believed that the changes he directed in the management at RRR would be carried out.

67.     Instead, weeks and months passed with no action by Cordek or Rappaport, or changes at RRR, and increasingly strained relations developed between the Estate and RRR as Rappaport openly joined with Cordek in defying Basciano and attempting to prevent the Executors from performing their duties to the Estate.

68.     To end the conflict, Basciano, in his capacity as Chairman of the Board, directed the termination of Cordek and Rappaport's employment at RRR.  Cordek and Rappaport ignored this directive, however, refused to relinquish their roles at RRR, and continued in their defiance of Basciano's authority as chairman of RRR.

69.     As these events unfolded, the Executors commenced a review of the activities of RRR and the actions of Cordek and Wil Rappaport.  As part of this investigation, in October 2000, they retained an independent certified public accountant, Frank A. Cresci, Jr., CPA ("Cresci"), to begin a review of the books and records of the Estate as prepared and maintained by RRR.  In a report dated October 31, 2000 (the "Cresci report"), a true and correct copy of which is attached hereto as Exhibit 2, Cresci advised the Executors that he had discovered numerous financial, tax, accounting and managerial deficiencies and irregularities in RRR's handling of the Estate's affairs, and recommended that the Management Agreement with RRR be terminated.

70.     In response to the Cresci report, the separate discovery that Cordek and Rappaport had disregarded specific leasing instructions from Basciano that resulted in financial losses to the Estate, as well as Cordek and Rappaport's misconduct at RRR and Cordek's past dishonesty involving the Metropolitan and Colonnade sales and the Historic Landmarks Transaction, Basciano informed Rappaport and RRR by letter dated November 30, 2000, that the Estate was terminating the Management Agreement with RRR for cause and expiration of its term, effective as of December 31, 2000.

71.     In retaliation for the Executor's termination notice, Rappaport convened a shareholders meeting of RRR and voted, as the sole shareholder of the company, to appoint a new board of directors for RRR, comprised of himself, his mother, and his sister, and formally removed Basciano as chairman of the board of RRR, effective January 11, 2001.  The new board also "reemployed" Rappaport and Cordek as president and treasurer, respectively, by unanimous resolution.

72.     In further retaliation for the Executors' termination notice, on January 29, 2001, Cordek and Rappaport caused RRR to file an equity action against the Executors in the Philadelphia County Court of Common Pleas seeking to enjoin the Estate's termination of the Management Agreement (the "Philadelphia action").

73.     Six months later, on June 4, 2001, Cordek and Rappaport orchestrated the filing by Wil and his mother and sister of "objections" to the Executors' account of the Estate in the Bucks County Orphans' Court, together with a petition seeking to have Basciano and Palmer removed as Executors and replaced by Wil and Tracy and an unspecified "corporate" fiduciary as administrators of the Estate (the "Orphans' Court proceeding").

74.     As part of these retaliatory litigations, which were brought for the purpose of preventing the Executors from continuing their investigations into the actions of the defendants, Cordek and Rappaport further orchestrated the filing of baseless, sham and meritless claims seeking the payment of additional monies from the Estate to RRR and Rita.

75.     As part of the Orphans' Court proceeding, Cordek and Rappaport have caused Rita to bring a claim against the Estate for the payment to her of an additional $2.5 million of distributions under the Family Settlement Agreement, despite the fact that she was overdrawn in her distributions under that agreement, had received over $7 million in total distributions since the date of decedent's death, and the claim is inconsistent with the positions previously taken by the counsel who negotiated the language of the Agreement on her behalf.

76.     In the Philadelphia action, Cordek and Rappaport have caused RRR to assert a claim against the Estate for nearly $1.2 million in additional "asset management fees" allegedly unpaid for six years under the provisions of the Management Agreement, despite the fact that it had received excessive fees which it owed back to the Estate, and had never previously asserted such a "claim" or disclosed its existence in the audited financial statements it prepared for the Estate.

### The End Of RRR's Control Over the Estate's Affairs

77.     By order and opinion dated March 4, 2002, the Philadelphia Court of Common Pleas determined that the Executors' notice to RRR of termination of the Management Agreement was proper, and ruled that the Agreement had been terminated as a matter of law effective December 31, 2000.

78.     As a consequence of this ruling, RRR's hold over the Estate's assets, books, records and property ended as of March 4, 2002.

79.     On March 15, 2002, RRR, Cordek and Rappaport vacated the Estate's offices taking with them all of the books, files and records of RRR, and the books, files and records of T&W and the Family Partnership which continue to be dominated, directed and controlled by Cordek and Rappaport.

### An IRS Audit Exposes Improper Actions by RRR

80.     In early 2001, the Estate received notice that the Internal Revenue Service ("IRS") was undertaking an audit of the fiduciary income tax return of the Estate as prepared and filed by RRR for its tax year ending August 31, 1999 which audit was later expanded to cover the Estate's tax years ending August 31, 1998 and August 31, 2000.

81.     Early in the audit, the IRS recognized the interrelationship between the Estate and RRR, and notified RRR that a separate audit of its income tax returns was going to be conducted for tax years 1997 through 1999.

82.     As part of its Estate audit, the IRS conducted an examination of the Estate's accounting records, financial statements and tax returns as prepared by RRR; reviewed the documentation relating to the Estate's relationship with RRR; reviewed the pleadings in the Philadelphia action; conducted interviews of Basciano and Wil Rappaport; and examined the amount of fees being paid to RRR under the Management Agreement to determine if such fees created excessive net operating losses on the Estate's returns.

83.     In the course of its audit the IRS questioned the necessity for the formation of RRR, taking the position that its creation was tantamount to a gift to Wil Rappaport as he had no experience or qualifications to manage the real estate holdings of the Estate yet was given through RRR a lucrative real estate management agreement for an initial three-year period with successive one-year renewals.  The IRS also questioned whether the fees being paid to RRR and

the lack of disclosure of RRR's claim for additional asset management fees on the audited financial statements of the Estate were attempts to manipulate net operating losses on the Estate's tax returns by persons in positions of authority at either the Estate or RRR.

84.     Upon the completion of its review, the IRS issued a final audit report (IRS Form 886-A), dated November 14, 2001, a true and correct copy of which is attached hereto as Exhibit 3, which determined that net operating losses resulting from the asset management fees being paid to RRR should not have been created or deducted on the Estate's tax returns by RRR, and that an income adjustment of $284,366 was required in the Estate's 1999 tax return.

85.     As a consequence of this adjustment, the Estate was assessed over $80,000 in tax liabilities and interest by the IRS, which assessment was settled and paid in or about January 2002.

86.     As part of its audit findings the IRS confirmed that the Estate's audited financial statements did not disclose the asset management fees being claimed by RRR, determined that RRR had failed to report as part of its income its rent-free use of the Estate's office space, and concluded that the Management Agreement with RRR had to be terminated to avoid future tax assessments against the Estate.  Exhibit 3 at 1-2 (Findings 4 and 5, and subparagraph (B)).

87.     No penalties were assessed against the Estate for the improper deductions taken on its returns by RRR as the IRS examiners had determined, following their interview with Basciano, that the Executors and their independent auditors were not participants in any plot to manipulate information on the returns and that the Executors had done everything in their power to terminate the Management Agreement and end the payment of excessive fees to RRR.

**The Executors Engage Deloitte & Touche To Conduct
A Forensic Examination Of The Estate's Records Because Of The
Questions Raised By The IRS Audit And The Cresci Report**

88.     In response to the IRS audit and the Cresci report, the Executors engaged Deloitte

& Touche LLP ("Deloitte") in early August 2001 to commence a comprehensive forensic review

of the Estate's books and records as controlled, prepared and maintained by RRR, including

related entity accounts involving the Estate's assets (the "Deloitte investigation").

89.     To date, the Deloitte investigation has uncovered and documented five (5)

interrelated schemes and artifices utilized by Cordek and Rappaport to defraud the Estate of over

$19 million of its cash, assets and property.

90.     Because the defendants have refused the Executors and Deloitte access to their

individual tax returns and income and expense information, the financial records of RRR

Management Company, the results of the separate IRS tax audit of RRR, and essential records of

the Family Partnership, the Executors' present evidence of fraud and the quantification of

damages suffered by the Estate are limited to the information that has been uncovered to date.

91.     Plaintiffs believe that additional evidentiary support for their claims will be

disclosed through discovery, and that such discovery is necessary in this case as the information

detailing and evidencing the defendants' fraudulent conduct is within the defendants' exclusive

knowledge, possession, custody and control, and has been knowingly and fraudulently concealed

by them from the Estate and its independent auditors.  As additional facts and evidence are

adduced, plaintiffs' causes of action will be supplemented by way of further amendment to their

claims.

### Defendants' Schemes And Artifices To Defraud

92.     The five separate schemes and artifices to defraud that have been engineered and carried out by defendants Cordek and Wil Rappaport are identified herein as the "PNC Cash Account Fraud," the "T&W Loan Fraud," the "T&W Distributions Fraud," the "D&S Loan Fraud," and the "Classic Outdoor Advertising Fraud."  These schemes and artifices to defraud have been pursued and fraudulently concealed by the defendants for an extended period of years, are, except for the PNC Cash Account Fraud and the Classic Outdoor Advertising Fraud, continuing through the present time, and will, unless redressed and enjoined through this suit, continue into the future as such schemes constitute the regular practice and pattern of the defendants' conduct of their affairs.

### The PNC Cash Account Fraud

93.     Commencing with the formation of RRR in September 1994, Cordek and Rappaport took control of the cash receipts of the Estate and established various bank accounts for the maintenance of the Estate's funds.

94.     Pursuant to the Management Agreement between RRR and the Estate, RRR's management of the Estate's assets, including the cash and funds of the Estate, was to be effectuated at all times under the direction and control of the Executors.

95.     To circumvent this requirement, in October 1996, Cordek and Rappaport conceived and implemented a scheme and artifice to place the majority of the Estate's funds beyond the control of the Executors by directing deposits of the Estate's excess cash into a bank account opened by Cordek and Rappaport in the name of RRR, and under its tax identification number, at PNC Bank in Philadelphia bearing account number 8611618906 (the "PNC Cash Account" or "PNC Account").

96.     To further this scheme and to ensure their control over the funds in the account, Cordek and Rappaport restricted check-writing power to the account solely to representatives of RRR, and required that all checks or other withdrawals from the account be accomplished only upon the signature of two RRR officers.

97.     Under these restrictions, the Executors could not access any of the funds in the PNC Account either individually or jointly.

98.     By creating the account in this manner, Cordek and Rappaport knew that the funds being deposited into the PNC Cash Account would be transferred out of the control of the Executors in violation of the terms of RRR's engagement as fiduciary for the Estate.

99.     As of February 8, 2002, the cash balance of Estate funds wrongfully converted by Cordek and Rappaport into the PNC Account totaled $3,700,934.

100.     To conceal and deceive the Executors as to the fate and whereabouts of the monies diverted into the PNC Account, Cordek and Rappaport caused weekly cash balance statements to be prepared and faxed interstate to Basciano at his New York office listing each bank account in which the cash assets of the Estate were being maintained as well as the bank accounts in which the cash assets of RRR and entities affiliated with the Estate were being maintained (the "Weekly Cash Balance Statements").

101.     Each of the Weekly Cash Balance Statements faxed from RRR's offices in Philadelphia to Basciano's offices in New York deceitfully and wrongfully listed the PNC Account under the name of the Estate, and included the balance of such account as among the total cash assets of the Estate.  Representative samples of the Weekly Cash Balance Statements for January 25, February 1 and February 8, 2002, are collectively attached hereto as Exhibit 4. Since October 1996, RRR has sent by interstate fax transmission over two hundred and fifty

402599

(250) Weekly Cash Balance Statements to the Executors in New York, all of which have falsely represented the PNC Cash Account balance as being held in the name of the Estate.

102.     As a part of their effort to conceal and deceive the Executors of the true nature of the PNC Cash Account, each of the Weekly Cash Balance Statements sent by Cordek and Rappaport also listed the bank accounts and cash balances of RRR, but failed to identify the PNC Cash Account as an RRR account.

103.     By failing to disclose the PNC Cash Account under the listing of bank accounts controlled by RRR, Cordek and Wil Rappaport repeatedly misrepresented and deceived the Executors as to the control and possession of the $3.7 million balance as part of their scheme to defraud the Estate of the possession, use and control of such funds.

104.     By misrepresenting the account holder of the PNC Cash Account, Cordek and Rappaport further deceived the Executors into believing that the entire $3.7 million balance in the account was secure, under their control, and available to them as part of the cash assets of the Estate.

105.     Despite knowing the true nature of the PNC Cash Account, and the fact that the funds in the account were under the possession, custody and control of RRR, Cordek and Rappaport lulled the Executors into believing that the funds were among the cash assets of the Estate through the fraud and artifice of listing the PNC Cash Account among the Estate's accounts in the Weekly Cash Balance Statements.

106.     To further conceal and deceive the Executors about the PNC Cash Account, Cordek and Rappaport caused RRR to prepare financial statements for the Estate, and had such statements subsequently certified by the Estate's outside auditors, listing the cash balance of the account among the assets of the Estate, even though it was known to Cordek and Rappaport that

such funds were not within the possession, custody or control of the Estate and should not have been listed among the current assets of the Estate due to the Estate's lack of ownership, possession, custody and control of such funds.

107.    As a consequence of this scheme and artifice, and in detrimental reliance upon the financial statements provided by RRR and audited under its supervision and control, the Estate has distributed such statements through the mails to the Estate's lenders, thereby exposing the Estate to default under the terms of the Estate's loans as such statements were materially false in their presentation and content respecting the cash assets of the Estate.

108.    As a further consequence of this scheme, the Estate has been subjected to the risk of having its loans accelerated by its lenders as the provision of the false and fraudulent financial statements to such lenders constituted a direct violation of the requirements of the loan agreements under which such loans were secured.

109.    The foregoing scheme to defraud was carried out by defendants Cordek and Rappaport directly, or by their duly authorized agents, servants and/or employees acting within the course and scope of their employment and under their direction and control.

110.    The foregoing scheme to defraud was carried out by the defendants through their use of interstate wire transmissions as aforesaid, and was further implemented by the knowing and foreseeable use of the mails by the Estate to distribute the false and fraudulent financial statements to its lenders, creditors and outside auditors.

111.    As a consequence of the defendants' fraud, the Estate was deprived of over $3.7 million, representing seventy percent (70%) of its total cash reserves, and the interest being earned thereon, for a period in excess of five (5) years.

112.    Although the PNC Cash Account Fraud ended in March 2002 when the Executors acquired possession of the funds from RRR by virtue of the decision of the Court of Common Pleas of Philadelphia County, the Estate is still being harmed by the scheme as its independent auditor, KPMG LLP, has been unable to complete its review or render its certification of the Estate's 2000 and 2001 financial statements because of the defendants' fraudulent misrepresentations of the PNC Cash Account and other wrongful actions.

113.    As a consequence, the Estate is in additional default of its loan agreements, and is subject to default penalties and the acceleration of its indebtedness, by its failure timely to provide the required audited financial statements for such years to its lenders.

114.    Defendants' scheme has also exposed the Estate to IRS tax scrutiny as a co-conspirator in the fraudulent preparation of RRR's and Wil Rappaport's tax returns.  RRR offset on its own tax returns the interest income it was receiving from the PNC Cash Account with fictitious interest expense to the Estate.  This was done in order to reduce the amount of pass-through income Wil Rappaport would have to report in his capacity as the sole shareholder and owner of RRR, a sub-chapter "S" corporation.  The fraudulent reporting was done to yield a substantial and continuing tax benefit in Rappaport's personal income tax return based on a dissimilar tax treatment of the interest income and interest expense.  See p. 3 of the Cresci report, Exhibit 2.

115.    Because the IRS views the Estate as an interrelated entity with RRR, any further examination of RRR's tax returns by the IRS will subject the Estate to additional IRS audit inquiries for open tax years, and expose the Estate to potential further tax liabilities, penalties and interest.

**The T&W Loan Fraud**

116.    T&W is ninety percent (90%) owned by Wil and Tracy Rappaport.  Wil Rappaport is the sole general partner of T&W, and is individually liable for its debts and obligations.

117.    At the time of his death, Samuel Rappaport was owed over $13 million for loans he funded to T&W during his life.  Upon his death, the loan receivable balance due from T&W became an asset of the Estate.  As indicated on the Deloitte spreadsheet analysis of the T&W loan receivable attached hereto as Exhibit 5, as of the date of the decedent's death, the outstanding loan balance due the Estate from T&W was $13,172,887.78 (Exhibit 9 at 2, Rows 32 and 33).

118.    Prior to his death, the decedent received monthly payments of principal and interest from T&W on the loan.

119.    As uncovered by the Deloitte investigation, commencing almost immediately after decedent's death, Cordek and Rappaport began to manipulate the books and records of the Estate and T&W to fraudulently reduce the balance of the T&W loan owed to the Estate in order to benefit Wil Rappaport financially.

120.    For example, on October 31, 1994, less than eight (8) weeks after the decedent's death, Cordek and Rappaport secretly reversed three interest payments totaling $249,579.93 that had been made on the loan during the months of August, September and October 1994, and restored such funds to T&W.

121.    Thereafter, in August 1995, defendants ceased making interest payments on the loan and instead began applying all payments in direct reduction of the principal balance of the

loan without interest credit or accrual, resulting in a loss of value of the loan in the amount of $4,217,486.55 as of December 31, 2000.

122.    Additionally, in October 1997 and February 1999, defendants further fraudulently reduced the principal balance of the loan by transferring for "credit" against the loan account two uncollectible loan receivables due T&W from affiliated third parties.

123.    The first of these fraudulent transfers, involving an affiliate known as RW Ventures, was in the amount of $2,418,567.64.  Exhibit 9 at 6, Row 160.

124.    The second, resulting from the T&W-affiliated D&S Loan Fraud described hereinafter, was in the amount of $670,000.  Exhibit 9 at 8, Row 207.

125.    By orchestrating and implementing the foregoing scheme, defendants have defrauded the Estate of $7,306,054.19 of T&W loan receivables as of December 31, 2000, in order to financially benefit Wil Rappaport.

126.    In furtherance of this scheme and artifice, defendants Cordek and Rappaport concealed from the Executors and deceived them of the loss of interest on the T&W loan through their secret manipulations of the loan account on the books and records of the Estate and T&W, and further concealed and deceived the Executors as to the proper balance due on the loan by misrepresenting the loan balance on the financial statements of the Estate.

127.    In a further effort to conceal and deceive the Executors as to the actual balance due on the T&W loan, defendants Cordek and Wil Rappaport falsely stated the balance of the T&W loan receivable to the Estate's auditors, and caused the auditors to certify erroneously such misrepresentations on the audited financial statements of the Estate for the years ending December 31, 1996, 1997, 1998 and 1999.

128.    As a consequence of this scheme and artifice, defendants Cordek and Wil Rappaport have caused false and fraudulent financial statements and tax returns to be prepared and mailed on behalf of the Estate, which do not reflect the correct principal balance of the loan or account for the interest due and payable to the Estate from T&W.

129.    As a further consequence of this scheme and artifice, defendants Cordek and Wil Rappaport have subjected the Estate to the risk of additional tax audits, and the potential acceleration of the Estate's loan indebtedness caused by the submission of false and fraudulent financial statements.

130.    The foregoing scheme to defraud was carried out by Cordek and Rappaport directly or by their duly authorized agents, servants and/or employees acting under their direction and control and within the course and scope of their employment, and has been implemented and furthered by the use of the mails and wires.

131.    As a consequence of the defendants' fraud, which is continuing to the present time and will, unless redressed and enjoined by this suit, continue into the future, the Estate has suffered a loss of T&W loan receivables in excess of $7.3 million as of December 31, 2000, and will suffer further losses as the amount of unpaid interest continues to accrue.

132.    By their unlawful conduct, defendants Cordek and Wil Rappaport have, since August 31, 1995 and continuing to the present time, continuously made false representations to the Estate and its auditors of the amount of the loan balance due from T&W Investments, and caused the Estate and its auditors, in reliance upon such misrepresentations, to repeatedly transmit through the mails and by wire over the last six years false and fraudulent financial statements and tax returns to the taxing authorities and the Estate's banking institutions, lenders and creditors.

133.    As a further consequence of this scheme, by denying the Estate its monthly payments of interest on the loan, Wil Rappaport has been unjustly enriched by the payments of over $286,000 in cash distributions from T&W that would have otherwise been paid to the Estate as interest on the loan.

134.    The fraudulent conduct complained of herein constitutes a long-standing scheme and artifice to defraud the Estate of the financial benefits of the T&W loan, and constitutes an injury to the business and property of the Estate, redressable under the provisions of 18 U.S.C. § 1964(c), in an amount in excess of $7.3 million.

### The T&W Distributions Fraud

135.    In a separate scheme related to the T&W Loan Fraud described above, Cordek and Rappaport have further defrauded the Estate of its ownership interests in T&W by making partnership distributions with the monies due the Estate for interest on the loan, and by disproportionately passing such distributions on to Wil and Tracy Rappaport at the expense of the Estate.

136.    As shown on the Deloitte spreadsheet analysis of T&W partner distributions attached hereto as Exhibit 6, during the time period the T&W loan receivable was being fraudulently reduced by Cordek and Rappaport, they wrongfully caused T&W to pay through December 31, 2000, the latest date for which T&W distribution figures are available to the Executors, a total of $644,880 of Estate money as T&W cash distributions to partners.

137.    Out of this total, $295,040 was paid to Wil, $295,400 was paid to Tracy, and $54,400 was paid to the Estate.

138.    As a ten percent (10%) owner of T&W, the Estate was entitled to receive ten percent (10%) of any distributions made by the partnership.

139.     In consequence, out of distributions totaling $644,880, the Estate should have been paid a total of $64,488, but only received $54,400.

140.     Thus, as part of their pattern of deceit and fraudulent conduct, defendants first deprived the Estate of over $600,000 of interest payments on the T&W Loan, and then shorted the Estate a total of $10,048 in distributions to which it had otherwise been entitled, and paid this amount as excess distributions to Wil and Tracy.

141.     As a consequence, as of December 31, 2000, Wil and Tracy have each wrongfully received over $295,000 in cash distributions from T&W (inclusive of their respective additional disproportionate excess distributions of $4,844 and $5,204) at the expense of the Estate.

142.     In connection with this scheme, Cordek and Rappaport repeatedly utilized the mails to transmit over eighty (80) T&W monthly distribution checks to Tracy Rappaport, copies of which are in the exclusive possession, custody and control of the defendants.

143.     The mailing of the monthly distribution checks to Tracy Rappaport together with the reduced remittances made to the Estate constituted repeated intentional misrepresentations by Cordek and Rappaport of the appropriate partnership share each partner was to receive by virtue of their percentage ownership interests in T&W, and also constituted repeated intentional misrepresentations that T&W was properly and lawfully distributing such funds as partnership assets.

144.     The fraudulent conduct engaged in by defendants commenced shortly after the decedent's death in September 1994, continues to the present time and will, unless redressed and enjoined by this suit, continue into the future, thus constituting a long-standing and continuous scheme to deprive the Estate of its assets, property and rightful share of partnership distributions.

402599

36

145.    At all times relevant herein, defendants Rappaport and Cordek owed a fiduciary duty to the Estate to properly and fairly divide any distributions from T&W in proportion to the ownership interests of its respective partners.

146.    By failing to provide the Estate with its proportionate share of distributions, defendants have violated their fiduciary duties to the Estate.

147.    The defendants have further violated their fiduciary duties to the Estate by conceiving and implementing the scheme to divert the interest due the Estate on the T&W Loan in order to make partnership distributions to Wil and Tracy.

148.    As a consequence of the defendants' wrongful actions, the Estate has suffered an injury to its business and property redressable under 18 U.S.C. § 1964(c) by being defrauded of its ownership interests in T&W, the interest due it on the T&W Loan in an amount in excess of $600,000 and out of partnership cash distributions in the amount of $10,048.00.

### The D&S Loan Fraud

149.    During his life, Samuel Rappaport made three separate loans to two individuals, William R. Dimeling and Richard R. Schreiber (hereinafter "D&S"), in the amounts of $500,000, $40,000 and $1,000,000.

150.    The $500,000 loan was advanced to D&S by the decedent personally.  The remaining two loans of $40,000 and $1,000,000 were advanced by the decedent to D&S through T&W.

151.    Pursuant to the repayment terms governing the loans, interest was to be paid monthly on all three loans, together with a single monthly payment of principal in the amount of $10,000 to be first applied to the $500,000 until paid in full, then to the $40,000 T&W loan until paid in full, and finally towards the $1,000,000 T&W loan until paid in full.

152.    Upon the decedent's death, the $500,000 loan became an asset of the Estate, and was administered by RRR on the Estate's behalf.  RRR also undertook the administration of the two T&W loans.

153.    As part of its administration of the loans, RRR prepared and mailed to D&S monthly invoice statements that directed remittances back to RRR.

154.    Upon receiving the D&S loan payments, commencing in October 1994, Cordek and Rappaport conceived and implemented a scheme and artifice to divert all payments of principal and interest received from D&S to T&W, and apply such payments in reduction of its T&W loans rather than the $500,000 Estate loan in direct violation of the repayment terms governing the loans.

155.    Through this scheme, Cordek and Rappaport wrongfully diverted during the period October 1994 through May 1999, a total of $522,275.14 of interest and principal payments that were due to the Estate into the accounts of T&W, and misapplied such funds first against the $40,000 T&W loan, and then towards the $1,000,000 T&W loan.  None of the payments were turned over to the Estate for credit against its $500,000 loan balance.

156.    The fraudulent purpose of this scheme was to further increase the amount of distributions Wil and Tracy were able to receive from T&W.

157.    As shown on Exhibit 7, RRR's journal entries for T&W distributions to partners, the average yearly T&W distributions to Wil and Tracy increased from approximately $9,000 each per year in 1994 and 1995, to an average of nearly $71,000 each per year from 1996 through 1998 as a consequence of this fraud.

158.     To conceal this fraud from the Executors and their independent auditors, the Deloitte investigation has discovered that Cordek and Rappaport fraudulently created and maintained two different sets of books to track payments on the D&S loans.

159.     The first set of books tracks the diverted payments to T&W and reflects the Estate's loan balance and the T&W loan balance as $500,000 and $670,000, respectively, as of December 31, 1998.  See journal entry records of RRR attached hereto as Exhibit 8.

160.     The second set of books reflects the balances of the Estate loan and the T&W loan as if the interest and principal payments received from D&S were properly first applied to the $500,000 Estate loan.  As of December 31, 1998, the second set of records reflects the loan due the Estate at $108,476.02, and the T&W loan at $1,000,000.  See journal entry records of RRR attached hereto as Exhibit 9.

161.     Commencing in early 1999, D&S began experiencing financial difficulties, was unable to keep current in its loan obligations, and by May of that year stopped making any further payments.

162.     Knowing of D&S' mounting financial problems and believing that the receivable was no longer collectible, in February 1999, Cordek and Rappaport made a secret transfer of the $670,000 D&S loan receivable balance off of the books of T&W and on to the books of the Estate.

163.     This transfer was accomplished by handwritten journal entries directed by Cordek and Rappaport upon the ledgers of T&W and the Estate.

164.     As part of this secret transfer, Cordek and Rappaport further caused an accounting entry to be made on the books of the Estate to reduce by $670,000 the principal balance of the

loan T&W separately owed to the Estate.  This transfer was done in furtherance of the separate T&W Loan Fraud scheme described in paragraphs 122 through 124, above.

165.    To conceal the $670,000 transfer, as well as the prior diversion of D&S loan payments to the accounts of T&W, Cordek and Rappaport continued to affirmatively misrepresent to the Executors, the Estate's independent auditors, and D&S the balances for the D&S loans notwithstanding the diversion of D&S payments into the accounts of T&W.

166.    For example, despite the fact that none of the D&S payments received by RRR from D&S through February 1999 were remitted or credited to the Estate, Cordek prepared and mailed to D&S two confirmation letters, copies of which are attached hereto as Exhibits 10 and 11 respectively, falsely representing that the loan balances were being carried on the books of the Estate and T&W in the respective amounts of $118,476.02, and $1,000,000.00 in accordance with the repayment terms under which D&S had been making its payments.

167.    Thereafter, on March 22, 1999, Cordek directed the preparation and mailing by RRR of two loan invoices to D&S, copies of which are respectively attached hereto as Exhibits 12 and 13, also falsely representing the principal loan balances of the D&S loans as if the payments had been credited in accordance with the loan repayment terms.

168.    Subsequently, on April 6, 1999, Cordek mailed another letter to D&S demanding confirmation of the loan balances as previously stated by Cordek, and threatened legal action in the event the confirmations were not returned and current payments were not received from D&S.  A true and correct copy of Cordek's April 6, 1999 letter and indebtedness confirmation is attached hereto as Exhibit 14.

169.    To further cover up and conceal their fraud, Cordek and Rappaport orchestrated the preparation of collection litigations against D&S by the Estate and T&W.

170.     As part of this continued cover-up, Cordek and Rappaport began to provide the Estate's attorney, Norman Oshtry, with false and fraudulent information for inclusion in the potential collection lawsuits.

171.     For example, on April 28, 1999, Cordek faxed to Oshtry copies of the monthly invoices that RRR had mailed to D&S as of April 22, 1999, both of which falsely misrepresented the loan balances due the Estate and T&W.  A true and correct copy of Cordek's April 28, 1999, facsimile transmission and attachments is attached hereto as Exhibit 15.

172.     Thereafter, in September 1999, Cordek and Rappaport orchestrated the filing of a complaint for confession of judgment against D&S on behalf of T&W, and a civil complaint against D&S on behalf of the Estate, seeking recovery of the misrepresented loan balances claimed by RRR to be due to T&W and the Estate.  Despite knowing the falsehood of the T&W claim, Wil Rappaport verified the complaint in confession of judgment filed on behalf of T&W against D&S.  See Complaint in Confession of Judgment filed by T&W against D&S attached hereto as Exhibit 16.

173.     At the time of the filing of the complaint in confession of judgment by T&W against D&S, Cordek and Rappaport knew or should have known that copies of the complaint and any judgment entered thereon would be served upon D&S through the mails, and thus intentionally utilized the means and instrumentalities of the mails to effectuate, further and complete their fraudulent scheme.

174.     Cordek and Rappaport also caused Oshtry to file on behalf of the Estate a civil action seeking recovery of the loan amounts Cordek and Rappaport misrepresented to the Estate as being due and owing on the D&S loan.  As part of this scheme, Cordek and Rappaport caused Oshtry to prepare verification for the complaint and procure Richard Basciano's signature on

such verification on behalf of the Estate.  By so doing, the defendants knowingly, willfully, purposefully and maliciously entrapped the Estate, its attorney and Basciano into submitting a misrepresented claim against D&S.  Notwithstanding their knowledge that the Estate had never received or been credited with the loan payments that RRR received from D&S and diverted to the benefit of T&W, Cordek and Rappaport corruptly caused the Estate to pursue the claim against D&S in order to further conceal their fraud and deceit from the Executors.

175.    As a consequence of the filing by T&W of its complaint in confession of judgment against D&S, on or about September 23, 1999, a money judgment in the amount of $1,085,438.08 was entered against D&S by the Court of Common Pleas of Philadelphia County.

176.    To avoid execution and end the running of interest on the T&W judgment, on November 10, 2000, D&S executed a demand judgment note in favor of T&W in the amount of $1,129,007.50, which note remains outstanding and subject to collection.

177.    Any recovery by T&W on the D&S demand judgment note would further enrich T&W at the expense of the Estate as the D&S loan balance to T&W has been reduced to zero by Cordek and Rappaport through the frauds and schemes described in paragraphs 135 through 148, above.

178.    As a consequence of defendants' scheme, the Estate has been wrongfully defrauded out of its D&S loan receivable and has suffered an injury to its business and property in the amount of $522,275.14 as of May 30, 1999.

**The Classic Outdoor Advertising Fraud**

179.    At the time of his death, the decedent was owed $12,053,964 from Classic Outdoor Advertising Company ("Classic"), a general partnership ninety percent (90%) owned by Wil and Tracy Rappaport.  The ten percent (10%) minority interest in the partnership was

divided among William R. Dimeling, Richard R. Schreiber and James F. Zaccario.  Classic was

an outdoor advertising billboard company doing business in South Carolina, Florida, New Jersey

and Pennsylvania.

180.    Of the $12,053,964 owed by Classic to the decedent, $11.6 million was

designated to Samuel Rappaport Real Estate ("SRRE"), a trade name the decedent utilized, and

the balance of $453,964 in his own name.  Upon decedent's death, the Classic loans became

receivables due and owing to the Estate.

181.    Wil and Tracy Rappaport together with the other general partners of Classic are

personally liable for its debts and obligations.

182.    Cordek had been involved in the operations of Classic for many years before the

decedent's death, and knew and understood the company and its business.  Morris Hershman, the

former counsel to the decedent and subsequent co-Executor of the Estate, also knew and

understood the business and operations of Classic.

183.    From and after decedent's death, Classic was controlled by Cordek, Morris

Hershman, and Wil Rappaport.

184.    After decedent's death, Cordek and Hershman pressed for a quick sale of Classic

to raise cash in order to obtain loan forgiveness, and they entered into negotiations with

Intervine, Inc. ("Intervine"), a company affiliated with Lewis Katz, one of the decedent's close

friends and business partners, for the sale of Classic's assets to Intervine.

185.    Relying on Cordek and Hershman, Basciano had little role in the negotiations, as

he was not knowledgeable about Classic, its ownership, assets or financial condition.

186.    On February 9, 1995, Hershman and Rappaport executed a letter of intent ("LOI")

for the sale of Classic to Intervine for a cash purchase price of $10 million.  The terms and

conditions of the LOI had been negotiated by Cordek and Hershman.  The LOI asserted that the

Estate would "benefit" from the transaction as a major creditor of Classic, and included the

Estate as a "seller" along with Classic.  The LOI further made the Estate jointly liable with

Classic for the transaction.  A copy of the LOI is attached hereto as Exhibit 17.

187.    As part of the transaction, Cordek and Hershman made representations to

Intervine about the value of Classic's assets, and provided Intervine with the company's financial

statements and other records.

188.    As part of its due diligence, Intervine commenced a review of Classic's

operations and the information provided by Cordek and Hershman.

189.    Intervine quickly uncovered serious problems at Classic, and learned that much of

the value assigned to the company by Cordek and Hershman was unsupported, particularly the

worth of many of its operating leases which constituted the lion's share of its assets.

190.    For example, Intervine discovered that over 70% of Classic's advertising sign

leases in its South Carolina division had, or were about to, expire, and that Classic had failed to

renew the leases in accordance with their terms.  <u>See</u> February 28, 1995 letter from Lewis Katz

to Carl Cordek attached hereto as Exhibit 18.

191.    Intervine also discovered that Classic had failed to submit permit applications for

many of its non-conforming signs, thus jeopardizing Intervine's ability to continue operating and

leasing the billboards in the future.  Intervine further discovered that many of the leases had

unfavorable use restrictions among their provisions that further reduced their value.

192.    As a consequence of these problems and for other reasons, the initial offering

price of $10 million was ultimately reduced to $8 million at Cordek and Hershman's suggestion.

193.     To make up for the reduced value of Classic's assets and maintain a purchase price of not less than $8 million, Cordek, Hershman and Rappaport proposed to include in the sale six (6) separate billboard properties owned by the Estate.

194.     Because the transaction could not proceed without the inclusion of additional properties to make up for the loss in value of Classic's assets and the sale proceeds were desperately needed to pay existing obligations and obtain nearly $8 million of additional bank debt forgiveness, Basciano acquiesced to the proposal on the express condition and understanding that the Estate would receive full value for the properties it was required to relinquish as part of the transaction.

195.     Cordek and Hershman represented to Norman Oshtry, counsel for the Estate, that the Estate would receive full credit for the value of its properties as part of the transaction.

196.     Basciano expressly relied upon these assurances in agreeing to the transaction.

197.     The six properties of the Estate had a total combined appraised and book (understated) value of $1,890,075.

198.     With the addition of the six properties owned by the Estate, the sale of Classic's assets to Intervine for a total of $8 million occurred on April 12, 1995.  The sale proceeds were applied by Cordek, Hershman and Rappaport to pay off a $1 million loan owed by Classic to Creel Outdoor Advertising (an unrelated third party), and a $7 million loan obligation to Continental (formerly MidLantic) Bank.

199.     Immediately after the closing, the South Carolina division of Classic started mailing invoices to Cordek and Rappaport at RRR for past due obligations Classic had incurred to vendors and other creditors prior to April 12, 1995.  RRR continued receiving such invoices through October 1996.

200.     Because the Classic sale proceeds had been fully applied to the payment of the Creel Outdoor Advertising loan and the Continental (formerly MidLantic) Bank loan, Classic had no remaining funds to pay the past due invoices, all of which remained the obligation of Classic.  These past due invoices had not been disclosed to Basciano prior to the sale of Classic. Cordek, Hershman and Rappaport had all of these obligations paid for by the Estate.

201.     In addition to paying past due obligations of Classic, Cordek, Hershman and Rappaport had the Estate make new "loans" to Classic after April 12, 1995 that they knew would not be repaid to the Estate.

202.     In the eighteen (18) month period between April 12, 1995 and October 28, 1996, Cordek, Hershman and Rappaport utilized the accounts of the Estate to pay a total of $393,574.14 for these obligations and new "loans."  See Deloitte spreadsheet analysis of check payments made to or on behalf of Classic attached hereto as Exhibit 19.

203.     To obtain Basciano's consent for the payments, Cordek, Hershman and Rappaport represented to Basciano that the Estate would receive full credit for these payments, and would be made whole for all of the post-closing advances it was making on Classic's behalf.

204.     Basciano expressly relied upon these representations and assurances in acquiescing to the payments.

205.     By October 28, 1996, defendants Cordek and Rappaport had expended a total of $2,283,649 in Estate assets for the benefit of Classic and Wil and Tracy Rappaport.  This total comprises the post-closing cash outlays made for new "loans" and to pay the bills of Classic of $393,574.14, and the minimum value of the six properties that Cordek, Hershman and Rappaport transferred to Intervine of $1,890,075.

206.     As uncovered by the Deloitte investigation, defendants Cordek and Rappaport conceived and implemented a series of schemes and artifices to defraud the Estate of the value of its properties, cash and loan receivables relating to Classic through a series of false and fraudulent accounting manipulations.

207.     The fraudulent purpose behind these schemes was to relieve Wil and Tracy Rappaport of their personal liability to the Estate and the principal remainderman under the will, decedent's grandchildren, for Classic's obligations.

208.     To implement these schemes, Cordek, in combination and conspiracy with Rappaport, directed the transfer in early 1995 of the $11.6 million SRRE loan receivable onto the books of the Family Partnership, and further directed that the transfer be backdated to appear that the transfer was done prior to the decedent's date of death on September 6, 1994.

209.     This fraudulent transfer was accomplished by having prior entries on the books of SRRE whited out and new entries written in their place by the accounting staff at RRR.  Copies of the falsely revised SRRE journal entries, showing the deletions, and related entries are collectively attached hereto as Exhibit 20.

210.     As a consequence of the backdating and changes to the journal entries, the Classic loan receivable to SRRE was removed as an asset of the Estate and fraudulently entered as a pre-1995 asset of the Family Partnership.

211.     Thereafter, Cordek fraudulently directed that the entire $11.6 million loan receivable be written off the books of the Family Partnership.

212.     This was done for the purpose of enabling the Family Partnership to receive a tax advantage of offsetting the Classic loan receivable "loss" against revenue accruing to the Family

Partnership from bank loan debt forgiveness, and to reduce revenue accruing to Wil and Tracy Rappaport from the write off of the Classic debt to the Estate.

213.    During this same period in 1995, Cordek directed the write-off of the $453,964.00 loan receivable that had been owed by Classic to the decedent.

214.    As a consequence of these transactions, the entire value of the Classic loan receivable previously owed to the Estate was secretly written off the books of the Estate by Cordek, Rappaport and RRR.

215.    Cordek, in combination and conspiracy with Rappaport, implemented a further scheme to defraud the Estate of the post-closing expenditures to or made on Classic's behalf by writing off the amounts paid as uncollectible.

216.    All of the foregoing write-offs and transfers occurred on the internal books of account for the Estate, SRRE and the Family Partnership, as prepared, maintained and controlled by Cordek, Rappaport and RRR.  The total charges transferred and written off among these accounts, including uncollected interest on the loan receivable balances, is in excess of $19 million.

217.    Not included in the foregoing figure is the additional loss to the Estate that resulted from the under-valuation and omissions of value by Cordek and Hershman for the six properties of the Estate that were transferred to Intervine in April 1995.

218.    At the time that Cordek made his representations regarding the value of the properties, he knew that the properties were given in exchange for no value in the transaction, and that the properties had a minimum appraisal and understated book value of $1,890,075.

219.    As a consequence of Cordek's failure to assign the proper valuations to these three properties, the Estate was defrauded by a minimum of $1,890,075 of the value of its realty.

220.    The foregoing schemes to defraud were carried out by defendants Cordek and Rappaport directly and/or by their duly authorized agents, servants and/or employees acting within the course and scope of their employment and under their direction and control.

221.    As a consequence of these schemes, the Estate has been injured in its business and property and has been exposed to the risk of additional IRS audits and assessment of tax liabilities, penalties and interest by the defendant's fraudulent transfer of the Estate's loan receivable balances to the Family Partnership.

222.    As part of the execution of the foregoing schemes and artifices, defendants repeatedly utilized the mails to deliver the 52 checks transmitted during the period April 12, 1995 through October 28, 1996, with the intent to deceive the Estate by falsely pretending and representing that the funds being utilized to make new "loans" to and pay for expenses of Classic would be repaid or otherwise restored to the Estate in full.

223.    Through their schemes, defendants have manipulated the books of account of the Estate, and its affiliated entities, for the purpose of financially benefiting Wil and Tracy Rappaport by relieving them of legal liabilities for the debts of Classic.

224.    As a consequence of defendants' fraud, plaintiffs have been injured in their business and property.

## COUNT I – RICO VIOLATION

### (18 U.S.C. § 1962(c))

### Richard Basciano and Lois M. Palmer as Executors of
### The Estate of Samuel Rappaport v. Carl Cordek and Wil Wes Rappaport

225.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

226.    At all relevant times, the Estate was a "person" as that term is defined in 18 U.S.C. § 1961(3).

227.    At all relevant times, each of the defendants Cordek and Rappaport were "persons" as defined in 18 U.S.C. § 1961(3).

228.    At all relevant times, each of RRR and T&W was an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

229.    At all relevant times, Cordek and Rappaport were employed by and associated with RRR and T&W.

230.    As alleged hereinabove, Cordek and Rappaport individually, and in combination with one another, controlled, conducted, directed and participated in the affairs of RRR and T&W through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and knowingly, purposefully and fraudulently concealed their acts of racketeering activity from discovery by the Estate and its independent auditors.

231.    At all relevant times, RRR and T&W have engaged in and are presently engaging in activities that affect interstate commerce within the meaning of 18 U.S.C. § 1962(c).

232.    At all relevant times, defendants Cordek and Rappaport conducted the affairs of RRR and T&W through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5), by engaging in repeated acts of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

233.    The pattern of racketeering activity engaged in by defendants involved repeated and numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 and 1346 through which defendants obtained money and property from the Estate by means of false and fraudulent pretenses and representations as alleged hereinabove.

234.    In the execution of their multiple schemes and artifices to defraud the Estate, defendants Cordek and Rappaport transmitted or caused to be transmitted by means of wire communications and through the use of the mails, the writings specifically identified in paragraphs 93 through 222, above, including, without limitation, the following wirings and/or mailings:

(a)    The Weekly Cash Balance Statements and financial statements used to implement, further and conceal the PNC Cash Account Fraud identified in paragraphs 100 through 107 above;

(b)    The financial statements, tax returns and audited financial statements used to implement, further and conceal the T&W Loan Fraud as specifically described and identified in paragraphs 127 through 132, above;

(c)    The 80 monthly distribution checks mailed to Tracy Rappaport in furtherance of the T&W Distributions Fraud as specifically described and identified in paragraphs 142 and 143, above; and

(d)    The letters, confirmations, statements, invoices, verifications and complaints mailed and faxed in furtherance of the D&S Loan Fund as specifically described and identified in paragraph 166 through 175, above.

(e)    The checks mailed in furtherance of the Classic Outdoor Advertising Fraud as specifically described in paragraph 222, above, and identified on Exhibit 23.

235.    In violation of 18 U.S.C. §§ 1341, 1343 and 1962(c), defendants orchestrated, conceived, implemented and furthered the above-described pattern of racketeering activity through schemes and artifices to defraud for the purpose of obtaining money and property from the Estate through false and fraudulent pretenses and representations, and knowingly sent and

received matter and caused matter to be sent and received through the United States Postal Service and by interstate wire transmission in the execution, commission and implementation of such schemes, and have defrauded the Estate of honest services in violation of 18 U.S.C. § 1346.

236.    The defendants' wrongful conduct and their participation in the conduct of the affairs of RRR and T&W through a pattern of racketeering activity proximately and directly caused injury to the Estate's business and property.

237.    The defendants' acts of racketeering activity as described above were related to each other by virtue of common participants, a common victim (the Estate), a common method and manner of commission, and the common purpose of defrauding the Estate of its assets and property and enriching the defendants at the Estate's expense.

238.    The schemes and artifices to defraud engaged in by the defendants have been fraudulently concealed by them, have been pursued over an extended period of years, are continuing in substantial part to the present, and will continue in substantial part as such schemes constitute the regular pattern and practice by which defendants conduct and participate in the affairs of RRR and T&W.

239.    The Estate's damages to its business and property are compensable under 18 U.S.C. § 1964(c), and include, but are not limited to, its losses in connection with the T&W Loan Fraud in an amount in excess of $7.3 million, the loss it has suffered through defendants' T&W Distributions Fraud in the amount of $644,880, the loss it has suffered through defendants' D&S Loan Fraud in the amount of $522,275.14, and the value of its property and cash assets wrongfully utilized, diverted and transferred as part of defendants' Classic Outdoor Advertising Fraud in an amount in excess of $19 million.

240.   Plaintiffs continue to be further damaged by the illegal and wrongful conduct of the defendants for which the Estate has no adequate remedy at law.  Accordingly, pursuant to 18 U.S.C. § 1964(a), and this Court's inherent equitable powers, plaintiffs request that the defendants be permanently enjoined from continuing their fraudulent schemes, that Cordek and Rappaport be removed from their positions of control and authority at RRR, T&W and the Family Partnership, that RRR be removed as the managing agent of T&W and the Family Partnership, that Rappaport be removed as the general partner of T&W and the Family Partnership, and that the Executors or their designees be appointed as the successor general partners of T&W and the Family Partnership.

241.   Because the defendants have been unjustly enriched at the expense of the Estate by their fraudulent conduct, the Estate also requests, pursuant to 18 U.S.C. § 1964(a), and this Court's inherent equitable powers, that the Court order each of the defendants to disgorge all profits realized from their schemes to defraud, and to return those profits to the Estate pursuant to a full and complete accounting.

WHEREFORE, the plaintiffs request the entry of judgment in their favor, and against defendants Cordek and Rappaport, jointly and severally, for:

      (a)     compensatory damages;

      (b)     treble damages;

      (c)     interest;

      (d)     attorneys' fees;

      (e)     costs;

      (f)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, requiring defendants Cordek and Rappaport to disgorge all profits

realized from their schemes to defraud and to return those profits to the Estate pursuant to a full and complete accounting;

(g)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, removing RRR as the manager of T&W and the Family Partnership;

(h)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, removing Wil Rappaport as the general partner of T&W and the Family Partnership and appointing the Executors or their designees as the successor general partners of T&W and the Family Partnership; and

(i)     for such other and further relief as the Court may deem proper and just.

## COUNT II – RICO CONSPIRACY

### (18 U.S. C. § 1962(d))

**Richard Basciano and Lois M. Palmer as Executors of The Estate
of Samuel Rappaport v. Carl Cordek and Wil Wes Rappaport**

242.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

243.     At all relevant times, defendants Cordek and Rappaport were "persons" as defined in 18 U.S.C. § 1961(3).

244.     At all relevant times, RRR and T&W were "enterprises" as that term is defined in 18 U.S.C. § 1961(4).

245.     At all relevant times, RRR and T&W were engaged in, and are presently engaging in, activities affecting interstate commerce within the meaning of 18 U.S.C. § 1962(c).

246.   At all relevant times, defendants Cordek and Rappaport conducted and participated in the affairs of RRR and T&W through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), and conspired and agreed to engage in such pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

247.   At all relevant times, defendants Cordek and Rappaport committed and caused to be committed a series of overt acts in furtherance of their combination and conspiracy, including but not limited to, the acts set forth hereinabove.

248.   Defendants Cordek and Rappaport knowingly and purposefully entered into their combination and conspiracy to commit the schemes and artifices to defraud as specified and set forth hereinabove, and knowingly, willfully and purposefully conspired and agreed to perpetrate such schemes and artifices for their own personal gain and enrichment, to the detriment and loss of the Estate, and to fraudulently conceal their schemes from the Estate and its independent auditors.

249.   Defendants, and each of them, had knowledge that their acts of racketeering activity as described hereinabove were part of, constituted and related to a pattern of activities conducted in violation of 18 U.S.C. § 1962(c).

250.   As a consequence of defendants' wrongful conduct and illegal combination and conspiracy as stated above, the Estate has been proximately and directly injured in its business and property by the actions of the defendants within the meaning of 18 U.S.C. § 1962(c).

WHEREFORE, plaintiffs request judgment in their favor and against the defendants for:

(a)   compensatory damages;

(b)   treble damages;

(c)   interest;

(d)     attorneys' fees;

(e)     costs;

(f)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, requiring defendants Cordek and Rappaport to disgorge all profits realized from their schemes to defraud and to return those profits to the Estate pursuant to a full and complete accounting;

(g)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, removing RRR as the managing agent of T&W and the Family Partnership;

(h)     an order of the Court pursuant to 18 U.S.C. § 1964(a), and/or pursuant to its inherent equitable powers, removing Wil Rappaport as the general partner of T&W and the Family Partnership, and appointing the Executors or their designees as the successor general partners of T&W and the Family Partnership; and

(i)     for such other and further relief as the Court may deem proper and just.


**COUNT III – BREACH OF FIDUCIARY DUTY**

**Richard Basciano and Lois M. Palmer as Executors of The Estate
of Samuel Rappaport, Derivatively on Behalf of The Samuel Rappaport
Family Partnership v. Wil Wes Rappaport and RRR Management Company, Inc.**


251.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

252.    As alleged in paragraph 8, above, the Estate is a limited partner of the Family Partnership owning ninety percent (90%) of the overall partnership interests.

253.    Rappaport is the sole general partner of the Family Partnership owning in his individual capacity five percent (5%) of the Family Partnership.  Tracy Rappaport owns the remaining five percent (5%) of the Family Partnership in her capacity as a limited partner.

254.    RRR is the agent of the Family Partnership and manages and administers its affairs and assets.

255.    Rappaport as the sole owner and president of RRR, controls the affairs of RRR.

256.    Under law, Rappaport, as general partner of the Partnership, and RRR, as managing agent, are charged with fiduciary duties owing to the Partnership and its limited partners.

257.    By virtue of his general partner status, Rappaport exercises complete control over the affairs of the Family Partnership.

258.    The principal asset of the Family Partnership is the Gateway Towers Garage located in Pittsburgh, Pennsylvania.

259.    By virtue of his control over the Family Partnership, Rappaport also controls and conducts the operations of the Gateway Garage.

260.    At all relevant times, Rappaport has been the general partner of the Family Partnership, and was in control of the Partnership at the time a portion of the façade and sign of a garage owned by the Partnership in Center City Philadelphia collapsed and struck Judge Berel Caesar who later died of his injuries.

261.    On or about April 20, 2001, Basciano received a copy of a letter addressed to Wil Rappaport dated April 17, 2001, from Lawrence C. Stocks, Vice President for Operations of Parkway Garage, Inc. ("Parkway") in Pittsburgh, a copy of which is attached hereto as Exhibit 21.

262.     At the time Stocks wrote to Rappaport, the Parkway Garage had been involved in negotiations with Rappaport and RRR for a contract to operate and manage the Gateway Towers Garage.  The April 17, 2001 letter from Stocks advised that Parkway had a contractor look at areas of concern at the Garage to estimate costs of repair to the Garage, excluding the cost of any repair or restoration work to the roof which was observed to be in poor condition and a potential liability risk.  The Stocks letter was in follow up to an earlier letter dated March 2, 2001, that Rappaport had received from Robert A. Zuritsky, an Executive Vice President at Parkway, which advised Rappaport that Parkway had "serious concerns about the physical structure" of the garage, and that before Parkway would consider taking over operations, it would require, *inter alia*, a complete structural analysis of the safety of the garage, and the removal and replacement of rusted drip pans which were in "danger of falling and causing injury."  See May 2, 2001 Zuritsky letter to Rappaport attached hereto as Exhibit 22.  Upon learning of the April 17, 2001, Stocks letter, Basciano contacted Rappaport to ascertain how he was going to respond to its contents.

263.     Rappaport advised Basciano that he had no intention of responding, as he perceived the Stocks letter to be a negotiating ploy over the contract terms that were being discussed.

264.     Although Basciano insisted that Rappaport take action on the matter, Rappaport made no commitments that he would do so.

265.     Recognizing the recklessness of Rappaport's dismissive attitude about a potentially hazardous condition at the Garage, Basciano persisted in demanding that the matter be investigated and immediately addressed.

266.     At a meeting on April 23, 2001 between Rappaport and Basciano, Rappaport ridiculed Basciano over his concerns of the conditions at the Garage, declared to Basciano that the general partner of the Family Partnership was the only person authorized to deal with the matter, and instructed Basciano to not speak with anyone or attempt to obtain additional information about the situation.

267.     Realizing the seriousness of the situation, and fearing that no action would be taken by Rappaport, Basciano ignored the outburst from Rappaport and contacted Richard Matlow, the president of the Gateway Towers Condominium Association, an adjacent property owner whose members utilized the Garage on a daily basis, and inquired whether Matlow knew anything about the condition of the Garage.

268.     Matlow told Basciano that portions of the concrete ceiling of the garage were falling, some weighing over 100 to 200 pounds, and had damaged cars at the facility.

269.     Acting in response to this information, Basciano again contacted Rappaport to insist that immediate investigation and corrective action be taken.  Basciano also insisted that representatives of RRR immediately visit the property, together with a structural engineer, so that a first-hand evaluation of the situation could be obtained.  Basciano also requested that he be immediately advised of the outcome of such visit, and of any recommendations or report that might be issued by the structural engineering consultant.

270.     After a delay of nearly a week with no word from Rappaport, Basciano again contacted Rappaport to request an update on the status of the garage, and the name and address of any consultant RRR had engaged to evaluate the garage so that Basciano could speak with the consultant and be apprised of the situation.

271.    Rappaport advised Basciano that a consultant had looked at the garage, but refused to disclose the identity of the consultant at that time.  Eventually, Rappaport forwarded a copy of a report prepared by Matco Associates, Inc. ("Matco"), a Pittsburgh-based corrosion engineer.  The Matco report was dated April 30, 2001, but transmitted to RRR's Pittsburgh counsel, Buchanan Ingersoll.  A true and correct copy of the Matco report is attached hereto as Exhibit 23.  Although the Matco report noted areas of concrete delamination and rebar corrosion within the ceiling of the garage, it did not recommend any immediate safety precautions based on its "conclusion" that "no obvious structural problems" existed at the Garage.

272.    Because the Matco report was not prepared by licensed structural engineers, Basciano independently commissioned an investigation of the Garage by L. Robert Kimball & Associates, licensed Pennsylvania structural engineers headquartered in the Pittsburgh area.

273.    After inspecting the garage and reviewing the Matco report, Kimball prepared its own report to the Executors, a true and correct copy of which is attached hereto as Exhibit 24.

274.    The conclusions reached by Kimball differ significantly from those reflected in the Matco report.  For example, Kimball, after observing evidence of excessive water damage, concrete spalling and exfoliation of steel joist reinforcing, concluded that a significant loss of positive movement reinforcing had occurred, and strongly recommended that those areas within the Garage where spalling had been observed be immediately barricaded from vehicular and pedestrian traffic.  Kimball also recommended that no vehicles, equipment or large groups of people be permitted on the plaza area above the garage, and that the surface roof area be excavated so that an immediate inspection could be made of the structural integrity of the roof framing.  Kimball also reported that the very limited sampling plan being recommended by

Matco was inadequate given the size of the Garage, and that measurements and core borings needed to be taken at all areas of spalling, corrosion and water damage.

275.     Believing that the recommendations of the Kimball report should be followed, the Executors notified Rappaport and RRR that the safety protocols and additional sampling being recommended by Kimball should be immediately implemented at the Garage.

276.     These recommendations were ignored.

277.     Subsequently, Basciano was advised by Richard Matlow that a public arts fair was scheduled to occur on the street level plaza area above the roof of the Garage, and that large numbers of people would be gathering on the plaza over the course of several days.

278.     Because Kimball had recommended against large gatherings on the roof plaza, the Executors advised RRR that the City of Pittsburgh should be immediately notified of the conditions at the Garage, and provided with copies of the Matco and Kimball reports for independent review by the City's Bureau of Building Inspection.

279.     Because RRR failed to timely and adequately advise the City of the situation, the Executors contacted the Bureau of Building Inspections to advise them of the structural issues at the garage and to alert them to the contents of the Matco and Kimball reports.

280.     The City of Pittsburgh, acting through its Bureau of Building Inspections, subsequently instructed RRR to implement the Kimball safety plan, barricade all areas within the garage that posed a safety risk, and undertake and submit within 180 days a comprehensive structural engineering inspection of the garage together with a work plan for the remedial measures which were being recommended.

281.   Because the Executors had already engaged Kimball & Associates, they suggested to RRR and Rappaport that Kimball work with Matco on a cooperative inspection and remediation protocol.

282.   Rappaport rejected any cooperative approach, and refused to allow the Estate's consulting engineers to participate in the inspections and investigations occurring at the Garage.

283.   After being denied the opportunity to have their structural engineers participate in the investigation of the Garage, the Executors repeatedly demanded that the Estate be timely provided with all information regarding the Garage in its capacity as the 90% limited partner, and that Rappaport as general partner of the Partnership, and RRR as agent for the Partnership, directly keep the Executors informed of the ongoing status and developments at the Garage.

284.   Despite these demands, Rappaport and RRR have failed and refused to provide the Executors with direct access to information, have failed and refused to communicate with the Executors directly over the status and condition of the Garage, have failed and refused to respond to questions of the Executors, and have taken the unreasonable and unlawful position that no information will be directly provided to the Executors, but that all requests for information from Rappaport or RRR be filtered through RRR's counsel.

285.   By taking these unreasonable positions and refusing the Executors information in their capacity as the 90% owner of the Partnership, Rappaport and RRR have violated their fiduciary duties to the Estate, have interfered with and violated the Estate's rights as a limited partner in the Partnership, and have risked catastrophe at the Garage by failing, despite repeated demand by the Estate, to timely and appropriately take actions necessary to ensure the public health and safety.

286.    By virtue of their actions, Rappaport and RRR have engaged in corrupt and outrageous actions in contravention of the interests of the Family Partnership and to oppress the rights of the Estate.

287.    Because of Rappaport's control of the Family Partnership as its sole general partner, his control of RRR as its sole shareholder and president, and his past refusals to protect the interests of the Partnership despite prior demands by the Executors, further demand to bring the derivative claims asserted herein would be futile, and is excused as a matter of law.

288.    Further demand is also futile as Rappaport has combined and conspired with Cordek, the general manager and controller of RRR, to conduct and operate, and continues to conduct and operate, RRR, the agent and fiduciary for the Family Partnership, in a manner contrary to the interests of the Family Partnership and in oppression of the Estate's rights despite repeated demands by the Executors that he cease and desist from doing so, and accordingly, he will not, and could not be expected to, pursue himself and his co-conspirator for the declaratory and equitable relief the Family Partnership requires in protection of its interests in this case.

289.    This action is not a collusive one to confer jurisdiction on a Court of the United States which said Court would not otherwise have.

WHEREFORE, plaintiffs request the entry of judgment in their favor and against defendants Rappaport and RRR, jointly and severally, for:

(a)    the entry of an order directing Rappaport and RRR to immediately provide the Executors with all information relating to the Garage, including, but not limited to, all consultant reports, work plans, cost estimates, contracts and other documents relating to the investigation and reporting of conditions at the garage, any proposal for the provision of repairs to the garage, copies of all information submitted to or received from the Bureau of Building

Inspections of the City of Pittsburgh, copies of all work permits and/or applications submitted to and/or issued by the City of Pittsburgh for work at the garage, and all other documents relating to or concerning the operations, physical condition, financial condition and current status of the Gateway Towers Garage;

(b)      the entry of an order declaring Rappaport and RRR in violation of their fiduciary duties to the Family Partnership;

(c)      the entry of an order enjoining Rappaport and RRR from further participation in the affairs of the Family Partnership;

(d)      the entry of an order removing RRR as the agent and fiduciary of the Family Partnership;

(e)      the entry of an order removing defendant Wil Rappaport as the general partner of the Family Partnership and substituting the Executors, or their designee, as the successor general partners of the Family Partnership; and

(f)      such other and further relief as the Court may deem proper and just.


## COUNT IV – COMMON LAW FRAUD

### Richard Basciano and Lois M. Palmer as Executors of
### The Estate of Samuel Rappaport v. Carl Cordek and Wil Rappaport

290.      Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

291.      By virtue of their misconduct and wrongful actions as alleged and set forth hereinabove, defendants Cordek and Rappaport have engaged in a massive fraud against the Estate, and have wrongfully injured the Estate through the commission of their multiple fraudulent schemes, actions, misrepresentations and concealments.

292.    Defendants engaged in the above-described actions to defraud and deceive the Estate with the intention that the Estate rely upon their material misrepresentations and intentional concealment.

293.    Defendants knew that their material misrepresentations and intentional concealments were false and fraudulent and made with reckless disregard for the truth.

294.    By virtue of the defendants' fraudulent actions and concealment, the Estate and its independent auditors were lulled and led into relying upon the misinformation being provided by the defendants, and such reliance was reasonable and justifiable under the circumstances.

295.    As a result of the intentional deceptions and material concealments and misrepresentations made by the defendants, the Estate has suffered and continues to suffer substantial injury and harm.

296.    Defendants' above-described actions encompass and constitute reckless, intentional, outrageous and malicious misconduct for which exemplary damages are warranted and should be awarded.

297.    Defendants are jointly and severally liable for all damages suffered by the Estate as a consequence of their misconduct, including but not limited to compensatory and punitive damages.

WHEREFORE, the Estate requests judgment in its favor and against the defendants Cordek and Rappaport, jointly and severally, for:

(a)    compensatory damages in an amount to be proven at trial;

(b)    punitive damages of sufficient amount to deter defendants from engaging or continuing to engage in outrageous and malicious fraudulent conduct;

(c)    the interest and cost of suit, including reasonable attorneys' fees;

(d)      the entry of an order removing defendant Wil Rappaport as the general partner of the Family Partnership and substituting the Executors, or their designee, as the successor general partners of the Family Partnership; and

(e)      such other relief as the Court may deem proper and just.

## COUNT V – COMMON LAW CONSPIRACY

### Richard Basciano and Lois M. Palmer as Executors of
### The Estate of Samuel Rappaport v. Carl Cordek and Wil Rappaport

298.      Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

299.      As set forth above, defendants Cordek and Rappaport combined and agreed to act in concert to injure, harm and defraud the Estate.

300.      In furtherance of their improper and illicit agreement, defendants engaged in the overt acts set forth above, purposefully to injure, harm and defraud the Estate.

301.      As a result of the defendants' actions in furtherance of their illicit combination, conspiracy and agreement, the Estate has suffered and will continue to suffer substantial harm.

302.      Defendants' actions, as set forth above, were outrageous and malicious, were undertaken intentionally to cause substantial injury and harm to the Estate, and were not privileged.

WHEREFORE, the Estate requests judgment in its favor and against defendants Cordek and Rappaport, jointly and severally, for:

(a)      compensatory and punitive damages in an amount to be determined at trial;

(b)      interest and costs of suit, including a reasonable attorneys' fee;

402599

(c)      the entry of an order removing defendant Wil Rappaport as the general partner of the Family Partnership and substituting the Executors, or their designee, as the successor general partners of the Family Partnership; and

(d)      such other and further relief as the Court may deem proper and just.

### COUNT VI – WASTE AND MISMANAGEMENT

**Richard Basciano and Lois M. Palmer as Executors of
The Estate of Samuel Rappaport, Derivatively on Behalf
of The Samuel Rappaport Family Partnership
v. Carl Cordek, RRR Management Company, Inc. and Wil Wes Rappaport**

303.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

304.    Through negligence and incompetence, defendants Cordek, RRR, and Rappaport have allowed the Gateway Towers Garage to suffer massive deterioration to its physical condition and structural integrity.

305.    By their negligence and incompetence, the defendants have failed to reasonably repair, maintain and preserve the Gateway Towers Garage, and have allowed and permitted the Garage to deteriorate into a condition of abject disrepair and to become unsafe.

306.    As a consequence of defendants' neglect, mismanagement and negligence, they have committed massive waste to occur to the Garage to the detriment of the Family Partnership, and have substantially impaired the value of the Garage to the detriment of the Partnership.

307.    This action is not a collusive one to confer jurisdiction on a Court of the United States which said Court would not otherwise have.

308.    As alleged previously, the Estate is a limited partner of the Family Partnership owning ninety percent (90%) of the overall partnership interests.

309.    Rappaport is the sole general partner of the Partnership, and the owner of RRR.

310.    RRR is the agent of the Partnership and manages its affairs and assets.

311.    Cordek is the general manager and controller of RRR, and supervises the day-to-day operations of the company.

312.    Because of Rappaport's corrupt control of the Family Partnership and its managing agent, RRR, demand to bring the derivative claim asserted herein is futile, and is excused as a matter of law as Rappaport would not and will not institute or maintain the claims asserted herein by bringing this action against himself in his capacity as general partner, or his company, RRR, in its capacity as the managing agent of the Partnership.

313.    Further demand is also futile and excused as Rappaport has corruptly failed to take the actions necessary to protect and preserve the property of the Family Partnership, despite repeated past demand by the Executors, has acted, and continues to act to oppress the rights of the Estate, and has acted and continues to act in derogation of the interests of the Family Partnership despite repeated past demands that he cease and desist from doing so.

WHEREFORE, derivative plaintiff the Samuel Rappaport Family Partnership requests judgment in its favor and against defendants Cordek, RRR and Rappaport, jointly and severally, for:

(a)    compensatory and punitive damages in an amount to be established at trial;

(b)    interest and costs of suit, including reasonable attorneys' fees;

402599                                              68

(c)     the entry of an order removing defendant Wil Rappaport as the general partner of the Family Partnership and substituting the Executors, or their designee, as the successor general partners of the Family Partnership; and

(d)     such other and further relief as the Court may deem proper and just.

## COUNT VII – BREACH OF CONTRACT

### Richard Basciano and Lois M. Palmer as Executors of
### The Estate of Samuel Rappaport v. T&W Rappaport Investments, Ltd.

314.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

315.   By virtue of the loans made by the decedent to T&W, T&W became indebted to the Estate in the amount of $13,172,887.78 as of September 1994.

316.   Through the schemes and artifices to defraud the Estate of the monies due it on the T&W Loan as set forth in paragraphs 116-134, above, T&W has failed to pay to the Estate $7,306,054.19 in principal and interest payments due on the loan as of December 31, 2000.

317.   As a consequence, T&W is in default of its loan obligations to the Estate, and is indebted to the Estate in the aforesaid amount.

318.   Despite demand, T&W has failed and refused, and continues to fail and refuse, to pay the sums due and owing to the Estate on its loan.

WHEREFORE, plaintiffs request judgment in their favor and against defendant T&W for:

(a)     compensatory damages in an amount to be established at trial in excess of $7.3 million;

(b)     pre-and post-judgment interest and costs of suit, including reasonable attorneys' fees; and

(c)     such other and further relief as the Court may deem proper and just.

## COUNT VIII – EQUITABLE RELIEF (INJUNCTION)

### Richard Basciano and Lois M. Palmer as Executors of the Estate of Samuel Rappaport v. Carl Cordek and Wil Wes Rappaport

319.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

320.    Defendants Cordek and Rappaport, in breach of their fiduciary obligations to the plaintiffs, have engaged in the illegal conduct alleged herein for the sole and improper purpose of financially benefiting themselves and others to the detriment of the Estate and the principal remainder beneficiaries under decedent's will as hereinabove alleged.

321.    By their unlawful conduct and schemes and artifices to defraud, the defendants have breached their fiduciary obligations and have engaged in acts of oppression against the Estate and its interests for which plaintiffs have no adequate remedy at law.

322.    Injunctive relief as requested herein is necessary to prevent further and irreparable harm to the plaintiffs.

WHEREFORE, plaintiffs request judgment in their favor and against defendants Cordek and Rappaport, to enjoin and restrain the defendants from taking further actions in oppression and derogation of the rights and interests of the Estate in both the Family Partnership and T&W, and to further enjoin and restrain the defendants from interfering with, obstructing, preventing and/or precluding the Executors from the performance of their fiduciary duties to manage, safeguard and protect all of the assets of the Estate.

## COUNT IX – DECLARATORY JUDGMENT

### Richard Basciano and Lois M. Palmer as Executors of the Estate
### of Samuel Rappaport v. Carl Cordek and Wil Wes Rappaport

323.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

324.     Defendants have undertaken the course of illegal and corrupt conduct as alleged hereinabove for the sole purpose of depriving the Estate and the principal remainder beneficiaries under decedent's will of their interests in the assets and property comprising the corpus of the trusts established under decedent's will to defendants' financial benefit.

325.     Defendants' conduct, as alleged hereinabove, constitutes willful and corrupt oppression of the business, property and financial interests of the Estate, and further constitutes a breach of fiduciary duties owed by the defendants to the Estate.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Cordek and Rappaport declaring them in breach of their fiduciary obligations and for such other and further relief as the Court may deem proper and just.

_____

Thomas A. Leonard (I.D. No. 14781)
Louis B. Kupperman (I.D. No. 22236)
Catherine Pyune McEldowney (I.D. No. 62748)
William K. Pelosi (I.D. No. 72882)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103-1895
(215) 665-3000

- and -

John A. Guernsey (I.D. No. 25730)
Kevin D. Kent (I.D. No. 85962)
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1916
(215) 864-9600

Attorneys for Plaintiffs

Dated:  August 23, 2002

402599